**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TIMOTHY MULDOON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 15 C 3588 |
| v. ) | |
| ) | Magistrate Judge |
| CAROLYN W. COLVIN, Acting ) | Michael T. Mason |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security (the "Commissioner") denying Claimant Timothy Muldoon's claim for Disability Insurance Benefits and Supplemental Security Income. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Claimant has moved for summary judgment (Dkt. No. 12), asking that the court reverse the decision of the ALJ. The Commissioner has responded (Dkt. No. 20), arguing that the decision of the ALJ should be affirmed. For the reasons that follow, Claimant's motion for summary judgment is granted and the Commissioner's request for summary judgment is denied.

**BACKGROUND**

**I.    PROCEDURAL HISTORY**

Claimant applied for benefits in September 2012, alleging disability since October 13, 2010 due to low back pain, limited mobility, arthritis in his knees, and depression. (R. 168–76, 217.) Claimant's application was denied initially and upon reconsideration,

after which he timely requested a hearing before an Administrative Law Judge ("ALJ"). (R. 122–24.) At a hearing held on December 5, 2013, Claimant personally appeared and testified before the ALJ. (R. 32–55.) On January 24, 2014, the ALJ issued a decision denying Claimant's request for benefits. (R. 24–34.) When the Appeals Council denied his request for review, the ALJ's decision became the final decision of the Commissioner, reviewable by the district court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II. MEDICAL EVIDENCE

### A. Treatment Records

Claimant worked as a sheet metal worker, producing and installing HVAC ductwork, until his alleged onset date in October 2010. He has a history of back pain and had three surgeries, including a spinal fusion at the L4–L5 level, in 2001 and 2004. (R. 35–37, 303.)

Claimant has also had knee trouble. In November 2010, Claimant consulted orthopedist Terry I. Younger, M.D. about right knee pain that he had been experiencing for about a year. (R. 311.) An MRI revealed a medial meniscal tear, chondromalacia,[1] and iliotibial band syndrome. (R. 312.) Claimant elected to undergo arthroscopic surgery, which was performed on November 16, 2010. (R. 297.) Six days later, he was doing very well and walking without difficulty. (R. 298.)

On August 6, 2011, Claimant reported to Stephen P. Behnke, M.D. that for two days he had been experiencing increasing back pain. (R. 319.) He reported that he had been doing home remodeling but did not know how he had injured himself. (*Id.*)

---

[1] Chondromalacia refers to a softening of the cartilage under the kneecap. http://www.dorlands.com//def.jsp?id=100020715

2

Dr. Behnke observed tenderness in Claimant's sacroiliac region and prescribed Mobic, an anti-inflammatory drug, in addition to rest and back exercises. (*Id.*) In September 2011, Claimant visited orthopedist Richard S. Rabinowitz, M.D. with continued complaints of lower back pain radiating to both legs, which he stated had been happening for about two months. (R. 300–02.) He had "done great up until this episode" since his back surgery in 2004. (R. 300.) Dr. Rabinowitz noted tenderness and mildly restricted ranges of motion in his lower back and a positive straight leg raise bilaterally. (R. 301.) A September 29, 2011 MRI revealed moderate to severe degenerative changes, disc bulging, or foraminal narrowing at all levels of Claimant's lumbar spine.[2] (R. 303.) On a return visit to Dr. Rabinowitz in October 2011, Claimant reported no improvement in his back and leg pain. (R. 306.) The orthopedist again noted mild generalized tenderness in the lumbar area, mildly restricted lumbar movement in all directions, and a positive bilateral straight leg test. (R. 307.) He referred Claimant for physical therapy. (*Id.*)

In November 2011, Claimant again visited Dr. Rabinowitz, this time reporting improvement in his back and leg pain following physical therapy, though he acknowledged that he was still taking Mobic daily for pain. (R. 309.) Upon physical

---

[2] The MRI results for the various levels of Claimant's lumbar spine read as follows: At the L1–L2 level, "Moderate facet degenerative changes and ligamentum flavum hypertrophy with mild narrowing of the lateral recesses;" at L2–L3, the same as above with the addition of "minimal bilateral foraminal narrowing;" at L3–L4, "Large annular bulge, more focal in the middle. Severe facet degenerative changes and ligamentum flavum hypertrophy with moderate to severe central canal narrowing. Moderate left and mild to moderate right foraminal narrowing." At the L4–L5 level, "[i]n addition to evidence of the earlier surgery, there was mass effect upon the central and left paracentral thecal sac along the epidural space with possible recurrent large disc protrusion. Mass effect upon the anterior thecal sac. Moderate facet degenerative changes. Moderate bilateral foraminal narrowing." At the L5–S1 level, "Mild annular bulge with small superimposed central protrusion. Moderate facet degenerative changes. Effacement of the anterior thecal sac. Moderate left and moderate to severe right foraminal narrowing." (R. 303–04.)

3

examination, he no longer had lumbar tenderness, though his movement was still mildly restricted. (R. 309.) A straight leg raise test was negative. (R. 310.)

In January 2012, Claimant suffered from anxiety due to a difficult family situation. (R. 318.) His primary care physician, Michael J. Osten, M.D., prescribed a fifteen-day course of Xanax. (*Id.*)

In the summer of 2012, Claimant worked as an overnight stocker at a Walmart store. (R. 241. 247.) In August 2012, Claimant saw orthopedist Ciro Cirrincione, M.D. for pain in his left knee, which was treated with an injection. He stated that he was taking Mobic (a nonsteroidal anti-inflammatory drug) for back pain. (R. 287–89.) On September 4, 2012, he reported to Dr. Rabinowitz that he had been experiencing back pain and bilateral thigh pain since starting his job at Walmart, and that his pain had worsened in the last week. (R. 342.) Dr. Rabinowitz noted that he was sensitive to touch over his lumbosacral nerve roots on both sides, but his straight leg raise tests were negative. (R. 343.) He also noted that Claimant's lumbar MRI revealed a herniated nucleus pulposus (hernitated disc) at the L5/S1 level and another at the L3-L4 levels of the spine. (*Id.*) He gave Claimant a Medrol Dose Pack, an oral steroid intended for short term use. (*Id.*) *See* "Oral Steroids," http://www.spine-health.com/treatment/pain-medication/oral-steroids) (last visited September 8, 2016.)

On September 14, 2012, Claimant consulted with a new orthopedist, Bruce J. Montella, M.D., regarding the pain in his lower back and legs. Claimant reported that the pain had built up gradually over his career as a sheet metal worker. (R. 356.) His pain was at 6/10 on the right and 8/10 on the left, and caused him trouble walking, bathing, kneeling, squatting, cleaning, putting on shoes or socks, reaching above the

4

head, reaching behind, driving, and sitting. (*Id.*) Dr. Montella observed mild lumbar spasms in the lower lumbar spine, diminished ranges of motion, and a positive straight leg raise. (R. 357.) He also noted that Claimant displayed zero out of five Waddell signs.[3] (*Id.*)

When he returned to Dr. Montella in October 2012, Claimant stated that his low back pain was constant and had not changed since his last visit, though a home exercise program did "help a little." (R. 354.) Dr. Montella again observed a positive straight leg test and noted no signs of incongruence or malingering. (R. 355.) Dr. Montella's notes from that visit include his opinion that Claimant was under "full and total disability." (*Id.*) In his third visit to Dr. Montella in February 2013, Claimant recounted that he was having low back pain with radiating pain and numbness to feet and toes. (R. 368.) He indicated that he had trouble sitting or standing for a long period of time. (*Id.*) Dr. Montella documented intermittent paraspinal spasms, limited lumbar ranges of motion, decreased motor function in the affected area, and a positive straight leg test. (R. 368–69.) The doctor again wrote that Claimant displayed zero out of five Waddell signs. (R. 369.)

In June 2013, Dr. Montella completed a questionnaire about Claimant's Residual Functional Capacity ("RFC"). (R. 379-81.) He reported that he had been treating Claimant since September 2012 for a diagnosis of lumbar disc herniation and symptoms including low back pain with bilateral radiating leg pain. (R. 379.) He opined that Claimant could sit for fifteen to twenty minutes continuously, stand for fifteen to twenty minutes continuously, and could alternate between sitting and standing for no more than

---

[3] *Dorland's* medical dictionary defines the Waddell signs as "signs indicating that a patient's low back pain is being intensified by psychological factors." http://www.dorlands.com//def.jsp?id=120887234 (last visited September 8, 2016.)

5

thirty minutes at a time. (R. 380.) Claimant must lie down twice a day to relieve pressure on his back, can walk up to one bock, and uses a cane for stability. (*Id.*) He can carry or lift between five and ten pounds. (*Id.*) He cannot tolerate heights or moving machines, and his symptoms worsen with cold weather. (R. 381.) Treatments include Norco and Mobic, and his prognosis is fair to poor. (R. 379.)

When he next saw Dr. Montella in August 2013, Claimant reported that his pain symptoms had not improved, and that he was also experiencing numbness and tingling through his groin area, primarily at night. (R. 385.) He was having difficulty sleeping through the night because of pain and was feeling increased pain in the area of the hardware from his earlier lumbar fusion surgery. (*Id.*) As on previous exams, Claimant displayed a positive straight leg test and zero out of five Waddell signs, with no signs of incongruence or malingering. (R. 386.) In November 2013, Dr. Montella observed similar findings, plus mild paraspinal muscle tenderness. (R. 397.) At that appointment, Claimant related that his pain varied day to day and that he was unable to sleep more than a couple of hours at a time, switching back and forth from his bed to a chair. (R. 396.)

  **B.**  **Consultants' Reports**

Two reviewing medical consultants conducted reviews of Claimant's file and issued opinions regarding his physical residual functional capacity. (R. 65–66; 85–88.) The first, Reynaldo Gotanco, M.D., found on November 29, 2012 that the record did not support all of the restrictions indicated by Dr. Montella. (R. 66.) Dr. Gotanco ultimately concluded that Claimant was capable of lifting up to ten pounds, standing or walking for a total of two hours in an eight-hour workday, and sitting (with normal breaks) for up to

6

six hours in an eight-hour workday, with some postural limitations. (R. 65–66.) He based this assessment in part on the positive straight leg test recorded by Dr. Montella in September 2012 and on undated MRI findings showing the results of Claimant's spinal fusion surgery. (R. 66.) Dr. Gotanco's assessment corresponded to a "sedentary" work level under Social Security Regulations. In a later review of the file, Vidya Madala, M.D. disagreed with Dr. Gotanco's assessment and instead found Claimant capable of lifting up to twenty pounds occasionally and ten pounds frequently, and opined that he was capable of standing or walking up to six hours in an eight-hour workday. Dr. Madala's assessment corresponded to a "light" work level. (R. 85–88.)

On October 31, 2012, Claimant was given a mental status exam by clinical psychologist Michael E. Stone, Psy.D. Claimant had a depressed affect and stated that he had difficulty maintaining an adequate level of energy and concentration. (R. 363.) His thought content was consistent with depression and anxiety. (*Id.*) He was able to perform some simple arithmetic, but he had trouble with multiplication and division and was unable to explain or interpret proverbs. (R. 363, 365.) Dr. Stone diagnosed depression secondary to medical problems and generalized anxiety disorder with panic, and judged Claimant incapable of managing his own benefits in his current circumstances. (*Id.*) After reviewing the consultative examiner's report, agency reviewer Terry A. Travis, M.D. concluded that Claimant's mental impairments caused Claimant no limitations in social functioning and only mild limitations in his activities of daily living and in his concentration, persistence, or pace. (R. 64.) Dr. Travis noted that Claimant's work-related limitations "related to physical constraints and not to mental

7

problems." (R. 64.) Another reviewer, Lionel Hudspeth, Psy.D., agreed with Dr. Travis's assessment on April 16, 2013. (R. 84–85.)

### C. <u>Claimant's Testimony</u>

On September 26, 2012, Claimant completed a Function Report in which he reported that he was unable to sit for more than twenty minutes or walk for more than thirty minutes at a time. (R. 227.) His sleep was disturbed by sharp stabbing pain in his legs that made it difficult to lie down for more than one hour at a time. (R. 228.) He was able to prepare lunches for his wife and kids and could sometimes walk his small dog around the block and perform light cleaning. (R. 228.) He attended church on Saturday evenings and attended his children's high school music concerts. (R. 231.)

At his hearing on December 5, 2013, Claimant testified that his back surgery in 2004 did not entirely alleviate his back pain, which had gradually worsened. (R. 39.) His pain increased when he attempted to work at Walmart. (R. 40.) He can no longer walk the dog or lift even a gallon of milk, and he takes a number of strong medications, which help "to a degree." (R. 40–41.) He has had arthroscopic surgery on both knees, but they are doing okay now. (R. 39, 41.) He feels more secure using a cane for walking and standing. (R. 42–43.) Shooting pain causes him difficulty doing household tasks, and he needs some assistance with bathing and dressing. (R. 46–47.) He ices his legs for pain relief. (R. 46.)

### D. <u>Vocational Expert Testimony</u>

At the hearing, the Vocational Expert ("VE") characterized Claimant's past sheet metal worker jobs as skilled work performed at the very heavy level. (R. 52–53.) The ALJ asked whether Claimant's past job could be performed by a hypothetical person

8

with the same age, education, and work experience as Claimant, who is capable of performing work at the light exertional level with the following restrictions: he can only occasionally climb ramps and stairs and only occasionally stoop, kneel, crouch and crawl; can never climb ladders, ropes, or scaffolds; and must avoid unprotected heights, dangerous moving machinery, and temperature extremes. (R. 53.) The VE responded that Claimant's past work would be precluded, but that such a person could perform the light, unskilled jobs of information clerk, clerical assistant, or housekeeping cleaner. (*Id.*) In response to another question from the ALJ, the VE testified that there would be no work available for a hypothetical person with the same vocational profile and environmental restrictions as the first, but who can perform no more than sedentary work, cannot push or pull, can sit or stand for only thirty minutes at a time, and requires a cane for both ambulation and standing. The VE identified the thirty-minute sit/stand restriction as the factor preclusive of employment. (R. 53–54.)

## **DISCUSSION**

**I.     ALJ LEGAL STANDARD**

Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in

the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  20 C.F.R. § 416.920(a)(4).  The claimant bears the burden of proof at steps one through four.  *Id.*  Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy.  *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Here, the ALJ found at step one that, since his alleged onset date of October 13, 2010, Claimant has not engaged in significant gainful activity; his brief period of employment at Walmart was an unsuccessful work attempt.  (R. 15.)  At step two, the ALJ concluded that Claimant has severe impairments of degenerative disc disease with a history of fusion surgery to the lumbar spine, and obesity.  (*Id.*)  The ALJ found at step three that the impairments, alone or in combination, do not meet or medically equal a Listing.  (R. 17–18.)  The ALJ then determined that Claimant retains the RFC to perform all light work, except that he can only occasionally climb ladders, ramps, ropes, scaffolds or stairs and can only occasionally balance, crouch, kneel, or crawl.  (R. 21.)  The ALJ found at step four that Claimant cannot not perform his past relevant work.  (R. 25.)  At step five, the ALJ concluded that, based upon the VE's testimony and Claimant's education, work experience, RFC, and age, he is able to perform jobs existing in significant numbers in the national economy.  (R. 26.)  As such, the ALJ entered a finding of not disabled.  (R. 27.)

## II. JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, or resolving conflicts in evidence. *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if "reasonable minds could differ" as long as "the decision is adequately supported") (citation omitted).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, she must "build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford*, 227 F.3d at 872. The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must

adequately articulate his analysis so that we can follow his reasoning . . . ."); *see Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence.").

## III. ANALYSIS

Claimant poses three arguments in support of his request for remand: (1) the ALJ erred in evaluating the medical opinion evidence; (2) the ALJ failed to consider the effect of Claimant's obesity on his impairments; and (3) the ALJ's assessment of his credibility was flawed. The Court agrees that the ALJ erred in evaluating the medical opinion evidence and remands on that basis.

### A. Analysis of Medical Opinion Evidence

In evaluating a claim of disability, an ALJ "must consider all medical opinions in the record." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013); *see* 20 C.F.R. § 404.1527(b). The opinion of a treating physician is afforded controlling weight if it is both "well-supported" by clinical and diagnostic evidence and "not inconsistent with the other substantial evidence" in the case record. 20 C.F.R. § 404.1527(c)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). Because of a treating doctor's "greater

12

familiarity with the claimant's condition and circumstances," *Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir. 2003), an ALJ must "offer 'good reasons' for discounting a treating physician's opinion." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citations omitted); *see also Stage v. Colvin,* 812 F.3d 1121, 1126 (7th Cir. 2016). Those reasons must be "supported by substantial evidence in the record; a contrary opinion of a non-examining source does not, by itself, suffice." *Campbell,* 627 F.3d at 306.

Where the opinions of different physicians diverge, the ALJ must weigh each opinion by considering such factors as "the length, nature, extent of the treatment relationship; frequency of examination; [each] physician's specialty, the type of tests performed, and the consistency and supportability of [each] opinion." *Scott v. Astrue,* 647 F.3d at 740; *Books v. Chater,* 91 F.3d 972 (1996). The ALJ must then provide a "sound explanation" for that decision. *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir. 2011).

Here, while acknowledging Dr. Montella's status as Claimant's treating physician and his specialty as an orthopedic surgeon, the ALJ afforded "no significant weight" to his October 2012 opinion in favor of a disability finding and "little weight" to his June 2013 RFC assessment. (R. 24.) Unfortunately, the ALJ's stated reasons for giving "little weight" to the treating physician's RFC assessments do not withstand scrutiny.

First, the ALJ found a conflict between Dr. Montella's report that he had seen Montella "every 3 or 4 months since September 2012" and the lack of notes from more than three meetings during that time. (R. 24.) However, three meetings over a ten-month period comes to an average very close to the frequency reported by the doctor.

The ALJ also rejected Dr. Montella's statement that Claimant had trouble with sitting, standing, and walking in part because "the claimant did not inform the surgeon of a problem with sitting." (R. 25.) To the contrary, Claimant twice told Dr. Montella that his back pain caused him trouble sitting. (R. 356, 368.)

The ALJ also found a conflict between physical examination notes indicating normal leg strength and Claimant's own reports that he had difficulty standing or sitting for any length of time. But Claimant does not allege that his difficulties with sitting, standing, and walking are caused by muscular or mechanical problems with his legs. He instead alleges that he has pain in his lower back with radiating pain and numbness in his legs and feet, and that these symptoms make it difficult for him to stand and walk. (R. 41–43, 46.) His leg strength is not relevant to that complaint. The ALJ further explained that "the limitations assessed…were based more on [Claimant's] pain complaints rather than [on] Dr. Montella's objective notes, which were scarce after the first visit." (R. 24.) The objective findings made by Dr. Montella during his exams were virtually identical for all three visits that preceded the date of his opinion: limited ranges of motion in the lumbar spine, paraspinal spasms, and a positive straight leg test. (R. 355, 357, 368–69.) Dr. Montella thus properly relied on both Claimant's pain complaints and on objective evidence in formulating his opinions.[4] The ALJ's stated rationales for rejecting Dr. Montella's RFC assessment are not supported by substantial evidence and do not constitute the requisite "good reasons" for rejecting a treating physician's opinion. *Campbell v. Astrue*, 627 F.3d at 306. As such, remand is required.

---

[4] Dr. Montella may have also relied on Claimant's September 2011 MRI findings, which included "moderate" and "severe" findings at every level of the lumbar spine. However, because Dr. Montella did not specifically reference the MRI results in his writings, the Court will not presume that this is the case.

14

Moreover, even where an ALJ properly declines to give controlling weight to a treating physician's opinion, she must explain the weight she does give to it and other available medical opinions. Here, the ALJ has failed to adequately explain why she gave "little weight" to the opinion of reviewer Dr. Gotanco and "more weight" to the opinion of reviewer Dr. Madala. In evaluating the opinions of two reviewing medical consultants, the ALJ made note of the conflict between them and elected to adopt the opinion of Dr. Madala, who determined that Claimant was capable of light work, over that of Dr. Gotanco, who assessed Claimant capable of only sedentary work. (R. 24.)

The ALJ offered two facts in support of her proposition that "evidence received at the hearing showed that [Claimant] was more capable than [Dr. Gotanco] had assessed." (R. 24.) First, she interpreted the success of Claimant's knee surgery as suggesting a "greater standing and walking tolerance" than that assessed by Dr. Gotanco. Again, this reflects her misunderstanding about the source of Claimant's difficulties with standing and walking, which proceed from his degenerative disc disease. Because his knees are not relevant to that disorder, even a successful knee surgery would not necessarily endow him with the ability to stand and walk for six hours out of an eight hour day. The second piece of evidence cited by the ALJ as evidence of his greater capability was Claimant's brief job stocking shelves at Walmart, which, according to the ALJ, "demonstrated a greater ability to lift." (R. 24.) This ignores the evidence that Claimant quit that job because his impairments left him unable to perform its demands. A work attempt that fails because the claimant's impairments prevent him from doing the work does not demonstrate the ability to do those or similar tasks consistently throughout the workday. Indeed, Claimant's unsuccessful effort at work

15

"might just as easily provide corroboration that [his] impairments significantly limited [his] ability to work." *McKinzey v. Astrue,* 641 F.3d 884, 891 (7th Cir. 2011).

Compounding the problem, the ALJ's reasons for giving "more weight" to the opinion of Dr. Madala also do not withstand scrutiny. To support her weighting of opinions, the ALJ simply asserted that Dr. Madala's opinion "reflected adequately the medical evidence available." (R. 24.) Dr. Madala, like Dr. Gotanco, did not indicate the date of the MRI results she examined. The MRI findings she listed were "posterior fusion with instrumentation," "[b]one consolidation of the graft," and "surgical well decompressed," all at the L4–L5 level of the spine. (R. 87.) This description omits any mention of the two herniated nuclei pulposi mentioned by Dr. Rabinowitz, and likewise ignores the "mass effect" and moderate "bilateral foraminal narrowing" present at the L4–L5 level and the multiple moderate to severe findings at the other levels of Claimant 's spine revealed by Claimant 's 2011 MRI. (R. 303.) Without any clear indication that Dr. Madala examined or considered that report, the ALJ's assertion that her opinion "adequately reflected the medical evidence available" is not supported by substantial evidence.

Because the ALJ's assessment of Claimant's residual functional capacity for light work was based in large part on her decision to weigh Dr. Madala's opinion more heavily than that of Dr. Gotanco, her failure to provide a "sound explanation" for that choice is an error that mandates remand. *Punzio,* 630 F.3d at 710.

### B. Remaining Arguments

Because this matter necessitates remand for the above reasons, the Court need not explore in detail at this time the remaining errors claimed by Claimant. However, in

light of the credibility argument raised by Claimant, the Court notes that the Social Security Administration has recently updated its guidance about evaluating symptom severity in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). The new ruling eliminates the term "credibility" from the SSA's sub-regulatory policies to "more closely follow [the] regulatory language regarding symptom evaluation" and to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1. Though SSR 16-3p post-dates the ALJ's hearing in this case, the application of a new social security regulation to matters on appeal is appropriate where, as here, the new regulation is a clarification of, rather than a change to, existing law. *Pope v. Shalala*, 998 F.2d 473, 482–483 (7th Cir. 1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999); *see also Hernandez v. Colvin,* 2016 WL 4681227 (N.D. Ill. Sept. 7, 2016). Therefore, the ALJ must on remand re-evaluate Claimant's subjective symptom statements in light of the guidance provided by SSR 16-3p.

## CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment is granted and the Commissioner's request for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.

_____

**Michael T. Mason**
**United States Magistrate Judge**

**Dated: September 22, 2016**

17